May it please the Court, Counsel, I'm Mike Hagelin for the appellants in this matter. This is a case where defendants, despite holding 33 to 43 percent market shares in four diagnostic imaging markets in Portland, and despite documented plans to acquire competitors, one to two hospitals, a major health insurance plan, and to employ or control no less than half of the new doctors entering the market over several years, were granted summary judgment because the district court found plaintiffs' evidence on barriers to entry and expansion insufficient as a matter of law. The district court was wrong for two reasons. First, plaintiffs did present evidence through three different doctors and multiple admissions and defendants' documents regarding barriers to entry, but the district judge inappropriately weighed the evidence at the summary judgment stage. And he should instead have concluded that there were disputed issues of fact on this point requiring a trial. Secondly, the district judge misunderstood the Ninth Circuit's controlling precedent in the Rebel Oil case and ignored our experts' opinion that the inelastic and non-transparent character of the health care market in Portland created conditions, i.e., barriers to expansion, where monopolistic pricing and imaging by Providence would not be subject to the discipline that the plaintiffs and other firms could bring to bear and would not self-correct. Providence is wrong in this case to argue that success by plaintiffs will bring an end to health care integration. If this case goes... Well, let's go right to that. Because as I look at this case, it doesn't seem to me to be a case about monopolization or attempted monopolization of imaging services. It's about monopolization of health care generally, control of the insurance market, or control of the customers through their insurers and through health plans. Now, I look at the increase in share attributed to Providence by your expert and the percentage increase here is close to trivial in terms of where he's gone. It's like 1 or 2 percent. And the argument isn't, as I understand it, that they've got such a stranglehold on imaging services they'll be able to control the market. The argument is they've got such control over the patients through the insurance panels and through their own health plan that that affects what imaging services people will go to, and that's how they'll control the market. But it isn't power in the imaging services market. Well, it is movement through the effort to impose a structure in the marketplace, impose conditions through a multi-tactic interlocking course of conduct that will give Providence market power in diagnostic imaging on an outpatient basis. Well, I really don't see how there's anything here that suggests they can exercise market power through their control of the imaging services market. There are too many other sources of imaging services. Your clients aren't being chased out of the market. They're there. They're there. And the argument about the power seems to disregard the fact that there is a price-sensitive player in this market. That's the insurance companies. They're not going to stand. They're the source of the power to the extent that they permit Providence to control the patients by whether you're listed on the panel or not. But they're very price-sensitive, and they're not going to voluntarily accede to a system that makes them pay premium prices for imaging services and other kinds of health care, because your argument isn't limited to imaging services. They're not going to stand and pay premium prices. Well, as our expert points out, where imaging is such a small portion of the insurance premium that an individual person may pay for health care insurance, you've got a situation where, as he opined, monopolistic pricing by Providence, with its large share of the market that he predicts will go above 50 percent through the combination of their various tactics, that as a result of those actions, they're going to be in a position to raise imaging prices within their own system, and the competitors who are outside of the system that they're propagating are not going to be able to bring any discipline to bear there because of the bundled character and the non-transparent inelastic character of this market. That assumes everybody stays in their system. They're not alone in the health care market. And, indeed, if you start talking about competing for those customers, you've got to bring Kaiser back into the picture. You have to recognize that Providence isn't even the largest player in the market. Blue Cross Blue Shield is. So where's the market power that's going to get transferred to imaging services? And where's the market? I have a real problem with the definition of the market and your insistence and your expert's insistence that it excludes southern Clark County and any other area besides the immediate metropolitan Portland area. In any antitrust case, the first step is to define the market, and both sides do that with experts, economists. We have the expert, Dr. Whitelaw on our side, was the lead expert for the plaintiffs in the most recent health care-related Ninth Circuit case, which is the Cascade Health case that came down earlier this year. The market definition question that an expert must address is highly fact-specific. And here you're going to have an expert on both sides. One is the defense expert is always going to try and have the broadest possible market. When you look carefully at the report that Dr. Whitelaw put forth that is in the record, it's clear that there's a reasonable basis for his conclusion that outpatient diagnostic imaging is a product. There are four different products. But what's complicated about this case is that you have these, I guess I'll call them insurance plans, Kaiser being, I guess, at one end of the scale where nobody is permitted to go outside, and then you have other health plans like maybe Blue Cross Blue Shield, I don't know, that allow you a little more flexibility in terms of choosing your provider as long as that provider is an authorized provider under the plan. And then I guess at the other end of the spectrum, you've got people who aren't insured at all who just pay cash, and they have to pay whatever the provider is charging for the services and not at the capitated rates that the insurance companies insist on. And it makes it really difficult in these cases in order to determine what the impact on competition is. Indeed, we have a hard time figuring out how the pricing is determined given the fact that these imaging providers are such a small portion of the greater provision of health care services under the Providence plan. That's all true, Your Honor, and that's why it's a mistake to try and analyze the case from the perspective that you're looking at the health care system in its totality. But your theory is attempted monopolization of diagnostic imaging, and we're struggling with trying to figure out, A, who's in the market, and, B, how the actions by Providence are going to control pricing and quality of imaging services that are otherwise available to the consuming patients who need those services. Well, leaving aside for the moment what I think are obviously factually supported market definition conclusions by Dr. Whitelaw, let me talk about the precise anti-competitive behavior we're accusing Providence of, because I think it helps understand this issue a little more deeply. We allege, and have the evidence in the record to show, that there is a combination of tactics both present and future. The present can really be distilled down to three primary items. One is imposing this structure through their preferred provider organization that is not their own health plan, per se, but it's a rented group of providers that they credential, and they made the decision to eliminate some very good providers, my clients, in an action that, in combination with other things, increases their market power over time. The other two... Increases their market share? I'm not sure there's anything that points to increase in market power by virtue of elimination of your clients, because you don't purport to say the power comes from their control of the imaging services market. Increasing the share in the imaging services market isn't the source of their power here. Well, I beg to differ, Your Honor. Dr. Whitelaw, our economist, shows how they're now above 40 percent in two modalities. So you've got no evidence that prices are increased? Or no evidence that prices are going to increase? No sign of market power in imaging services? Well, we... Increasing the share from 38 to 40 doesn't demonstrate market power if you can't change the prices. Well, the key in an attempted case is not that you're showing that the prices have gone up because the defendant is not yet a monopolist. The key in an attempted case is being able to show, with your evidence, that they're on a path to get there. The whole purpose of this kind of a case is to stop a rising monopolist from achieving that. But their power doesn't come from having 40 percent in the market? Well, their power will come once they're above 50 percent, as our expert concludes. I mean, some of... Without evidence of actual power, what I hear you saying is that someday they may be a monopolist and they're on their way, and that's enough to withstand a motion for summary judgment. I'm not sure that the law supports that argument. Well, if you look at Rebel Oil, you look at Weyerhaeuser, those were cases where the Ninth Circuit concluded that if you have a 44 percent market share, you're presumptively above the level you need for an attempted case. You've got to show barriers to entry, which we have. You've got to show specific intent to monopolize. You say you've shown barriers to entry, but as I understand the briefing, you concede that there is excess capacity at the moment. That's true, but that's what makes this case so different from Rebel Oil. In Rebel Oil, it was undisputed that the excess capacity of those wholesale gasoline dealers would enable them, if ARCO pushed prices up to monopoly levels, super competitive prices, that these other existing competitors could simply pump more gas and the market would self-correct. Here we have a situation where, as our expert explains, the non-transparent, inelastic character of the market puts Providence in a position, and they did increase prices immediately after terminating Epic and body imaging in 2005. But what he explains is that once they have that market power, they're above 50 percent, they're going to be able to increase diagnostic imaging prices to levels that, even though my clients have excess capacity and there may be other excess capacity in the market, they're not going to be able to attract those referrals because they are steered or shunted into a system that, for transparency and price reasons, people are not going to be able to move to the competitors and take advantage of that excess capacity. That's why I say that you're not really talking of a monopoly of the imaging services market. You're claiming the market power comes from someplace else, the control over the patients and or the payers for the patients, the insurance carriers. Well, that's a very different market. I don't see anything offered by your expert or by your case that supports the proposition that there's any serious substantial, probable, whatever risk of monopolization, control over patients to that extent. And the biggest thing I said there and scratched my head about is that the insurance carriers aren't going to stand for it. I mean, the inelasticity you talk about is because you're restricted to people, to providers in the panel. But the insurance carrier is not going to pay a premium price for this panel if they can get the services from someplace else. Insurance carriers are not necessarily going to know because of the very scale. Sure, they're going to know. They're paying the bills. Well, the total fraction of the premium that the patient is paying for their insurance policy. Then you're suggesting the reason that the payers won't care is because the impact is too insignificant for them to notice. I think that's highly unlikely because insurance carriers are money-driven. But that also suggests there isn't really power then, is there? Because you can't raise a price so high enough that anybody's going to notice. Well, if you're suggesting, Your Honor, that the fact that they're constructing a market structure here that is going to give them control over the sources of referrals, where people go to have imaging services occur, is not a constraint that the antitrust laws can get at. It's not a constraint on monopolization of imaging services, not as long as there are other customers available. A monopoly means you control. You've got a handle on the supply. The reason barriers to entry matter is if somebody else can come and provide supply, then you don't have that monopoly or don't have the risk of monopoly. The barriers to entry here, none of them seem to have to do with imaging services that you or your expert have offered up. They have to do with purported control over a different market. And I just don't see where that control comes from. Well, the other actions that we complain about, I think, help paint the picture more clearly. If Providence succeeds in its plans to acquire a competitor hospital, to acquire a large health plan, if it ends up with six or seven- Maybe there's a monopoly case. But those are huge ifs, and they don't have to do with imaging services. They have to do with hospitals or health plans or something else. Maybe there's a case there, but that's not the case you've tried to make here. Well, it is in that you have to, the root of any antitrust case is the product market. And has the defendant, is the defendant in an attempted monopolization case on a path so that they would have sufficient market share, because the control comes with market share. And our expert has, I think, clearly set forth how it is that they're on a path that combines present anti-competitive behavior, the exclusion from the PPO, but also misrepresentations as to insurance options with respect to the referral that is going on. When people call the referral people associated with Providence, we've got evidence in the record that they are misrepresenting the insurance options. That's clearly anti-competitive. Their euphemism for that misrepresentation is searing, but the reality remains that it's an anti-competitive behavior. The refusal to engage in electronic linkage is a further constraint that doesn't, they may be able to clothe it with a pro-competitive reason or objective, but it is anti-competitive in terms of its impact on the ability of this market to compete for the sources of radiology business energy, which are the referring doctors. I'll reserve the balance of my time. I was just going to ask if you wanted to save some time. Okay, Mr. Hagelin, thank you. Thank you. We'll hear from Mr. Ross. Thank you, Your Honors. And may it please the Court, I'm Doug Ross. I represent the Providence defendants in this matter. The Court can affirm the summary judgment on any basis provided in the record, not just barriers to entry, but any of the arguments that we identified in our brief. This morning I want to confine myself to the barriers to entry and to the conduct discussion, and I want to be sure to try to hit on the issue that Judge Clifton raised and that you raised, Judge Tallman, on the market and market power. I think that Judge Clifton is absolutely correct that what plaintiffs are claiming is the barrier here is that they argue is that in order to get into this market, you've got to be on the Providence health plan or PPO's panel. But in saying that, there's a massive confusion that is going on. They're confusing the panel with the market. The market that they claim that Providence tried to monopolize is, as has been said, the market for four kinds of diagnostic imaging. Yet they say in other parts of their briefing, they seem to suggest that the market somehow is the market in which the health plan operates, which is the market for health care financing, which does range from Medicare, Medicaid, to commercial payers, to people who pay on their own, or people who don't pay. And what plaintiffs are arguing is that Providence has some kind of stranglehold over this health care financing market that makes it difficult for any diagnostic imaging provider to get into the diagnostic imaging market because you have to have a spot on the Providence panel. The problems with that argument are legion. First of all, the evidence is clear. It's uncontroverted. You don't have to have a spot on the Providence panel in order to get into the diagnostic imaging market. We cite in our brief, I think it's pages 48 to 49, nine different companies that have entered or expanded through new locations in the five years before this case, not a one of which is a Providence company. That's not counting PMI and CMI, these two joint ventures. And of those nine, only one, the Tuolity Imaging Center, is on the Providence panel, the other eight are not. So you don't have to be on the Providence panel in order to get into the market or expand the capacity that you've got in that market. As an evidentiary matter, there's no evidence. Am I correct that the plaintiff diagnostic centers are also providers of other diagnostic imaging services to other plans besides Providence? Yes, Your Honor.  Okay. So they're not in a situation where they can say, but for Providence's action, we have no patients that we can provide diagnostic imaging services to. We've basically been shut out of the market. That's absolutely correct, and that's the key element here. That's the problem here. Because there's no evidence in this record that Providence has market power in the health plan market, there is no way for the plaintiffs to sustain this argument that there is a barrier to diagnostic imaging centers getting into the market in which they provide their service. If the argument was, Providence is so large, you've got to be on its panel in order to sell imaging services, that would be understandable. But there's no evidence Providence is so large. Their expert, when I asked him in his deposition about the health care financing market and what his findings were in that area, he said he didn't understand what the relevance of that was, and that there were no findings he had in that area. The only evidence we have in this record is the evidence we put in, which shows the health plan is the fifth or sixth largest health plan in the area. The PPO competes with many other PPOs. It lost 30% of its enrollment in the two or three years before this litigation was filed. The evidence that's in the record is of a healthy, robust, competitive health plan market. So, therefore, there's no logical reason to believe that you have to be on the Providence health plan in order to compete as a diagnostic imaging provider. And my point about those nine centers that have just gotten into the market is there's also no evidentiary basis to suppose you have to be on the health plan to compete. And if you look at page two of our brief, we have three long footnotes with about 50 different providers. And if you take out the couple that are in the Vancouver area, all the rest are in the Tri-County area. And many, many of those, as identified in Mr. Jackson's declaration, have never been in the Providence health plan. So there simply is no evidence of this structural component to the barrier that Mr. Haglund identified. Let's talk about the conduct. And I'm going to come back to this same issue in a moment. The plaintiffs say that there is this tremendous course of conduct which is going to lead Providence to a monopoly in diagnostic imaging one day. What started this case was their termination as providers on the panel. And on pages eight to nine of their last brief, where they had tried to identify lots of conduct that they say Providence has engaged in, they end up by saying factually the most significant conduct nonetheless still is this termination of the plaintiffs from the panel. And that's really what this case is about. Now, Mr. Haglund says there was steering going on. Let's stop on that for a moment. Let's suppose that there was. All that is saying is that while we were on the panel, you guys were directing business to your own providers. That's a lesser problem than the termination, which cut the business off altogether. So we're talking about whether Providence, as an integrated entity, has the ability to refer business to its own providers, whether Providence as a health plan has the ability to choose who those providers will be. There is no case that has suggested that a health plan can't choose with whom it will deal in the absence of market power at the health plan level, to get back to the question of Judge Clifton and Judge Palmer. Without some showing of real market power there, there's no case. And the case that I would recommend to the Court is the First Circus decision, Judge Boudin's decision in Stop and Shop. Exact same case is here. A health plan limits the number of pharmacies on its provider panel. There's a lawsuit. Judge Boudin says, look, if your claim, the only claim of anti-competitive conduct that makes any sense here, is if you're saying that by limiting your panel, you're making it impossible for all the other pharmacies to stay in business, they'll all go out of business, that will allow the few pharmacies who are on your panel to raise price, and that will be anti-competitive. That's a theory I can understand. But if you're going to show that, plaintiff, said Judge Kadeem, you've got to show that this health plan, in that case it was a blue cross blue shield, accounts for a substantial portion of the health care financing market. And if you don't jump that first hurdle, end of case, and he affirms summary judgment for the defendant. They've never jumped that first hurdle here. Their expert didn't even understand that that hurdle was important. Instead, they characterized this as a refusal to deal case. At Providence, you've got a health plan and you're refusing to put our people on it. But all of the cases, the Abraham case in the Tenth Circuit, Levine in the Eleventh, the Doctors Hospital case in the Fifth Circuit, the Klamath Lake case in this circuit from years ago, the Barry against Blue Cross case in this circuit, all of these cases make absolutely clear that a health plan can choose the providers with whom it will deal. And the only theory they could have is if that health plan had substantial market power, they've never come forward with that. I would also point this Court to Trinko and this Court's decision in the Metro Net Quest case that followed Trinko. The general antitrust rule is that a competitor doesn't have to deal with people it doesn't want to deal with. You don't have to deal with your competitors. You can't be forced into doing business with them if you don't want to. The two exceptions to that rule recognized by this Court in Metro Net against Quest were first, if you had a monopolist in control of a central facility. This is Billy on Aspen skiing as interpreted by Trinko. We don't have a monopolist here. By their admission, Providence doesn't have a monopoly in diagnostic imaging and they've put no evidence in the record to suggest it has a monopoly anywhere else. We also don't have an essential facility. I've just explained how our health plan cannot hardly be considered an essential facility to anything. So what's the next idea? The next idea, as explained again, Trinko explaining Aspen and Metro Net, construing them both, if you had a company with market power, again, no showing of that here, which engages in a refusal to deal that costs it money, a profit sacrifice, you might say, why is that company refusing to deal with these other people? Maybe it's because they're trying to monopolize the market. But here we have just the opposite. This isn't economically irrational behavior, refusing to have these people on the panel. It's economically rational. If you're just going to look at it in terms of the profit sacrifice test, clearly when Providence decides to do business with its own outpatient centers instead of competitors, that's economically rational. So you can't, and they haven't really tried, squeeze this case in that exception. So we come back to this is a plain, vanilla situation where a health plan has decided it doesn't want to deal with certain providers. That's a refusal to deal that is permitted by the antitrust laws. It doesn't fall into the exceptions that Metro Net identified of essential facility or profit sacrifice. What other theory is there? Part of our brief at the end, you may have wondered why it was there. We discussed foreclosure, exclusive contracting. That could be the theory they could have had. That's the stock and shop theory. But they would have had to come forward with evidence of market power in the health plan market. They never did that. Therefore, they have no theory. There is no antitrust violation here. There are no barriers. They have a theory. And attempted monopolization cases can be tricky because you start projecting what's going to happen next. So it's like the frog in the pot of water. If you turn it up one degree at a time, you don't notice. And so I can raise a question, and in fact did, that 2%, 3% is essentially trivial. But then plaintiffs have an expert who opines that there are these other things coming together and other reasons to suspect that, in fact, they will be able to acquire power. And so that this is the first step down the path. Now, there are attempted monopolization cases that open the door to that kind of argument. They don't open it to the argument they make, Your Honor. There are cases on course of conduct, but let me explain. If you look at, and we have looked at this very carefully because in the oral argument at the district court stage, the district court judge asked us about that and then granted plaintiff additional time to brief it. So this issue has been briefed thoroughly in the cases, and the arguments have ended up in these briefs as well. And it's very clear that what happens in an attempted monopolization case with a course of conduct is the following. First, you've got to show any competitive conduct. Then you have to show a specific intent. Those are the first two elements of the offense. Then you have to show that there's a dangerous probability that the anti-competitive conduct, if left unchecked, will lead to a monopoly. So if you look at those cases, what you typically see is an argument that the defendant was engaged in a certain course of conduct such as predatory pricing, and that conduct, if left unchecked, is going to get the defendant to a monopoly. Here, the conduct that we are said to have engaged in pre the lawsuit is the termination of plaintiffs and the steering and the opening of new centers, which by no stretch of the imagination can be anti-competitive. But that conduct is over. We can't terminate them again and again and again. And they know that. And that conduct, when we engaged in it, increased these market shares by what are trivial amounts, 1.5 to 3.5%. That's it. We can't continue to increase our diagnostic shares by terminating plaintiffs. That's been happened. That's happened already. So then they say, let's look at absolutely completely unrelated conduct that may happen in the future and say that that puts Providence on a glide path to monopoly. There are substantial problems with that. There are problems with the conduct to which they point in the future because much of it is completely speculative and some of the key components of it, the evidence is uncontroverted, simply can't occur. This idea will acquire a health plan? It was acquired. That we'll buy Willamette Hospital? That's hearsay, never substantiated, and the head of Willamette Hospital said, I'm not selling. Other things? Yes, we plan to open some new physician centers, hire new doctors, all of this sort of thing. But the key components are gross speculation. How will those components, even if we do all of them, translate into increased imaging business? The expert had no idea. He doesn't know how much imaging business comes from a given doctor or a hospital or anything else. But suppose it does. How will that imaging business translate into a higher market share? Don't you have to make some assumptions about what everyone else in the market is going to do? How many people are going to come into the Portland area? The expert had no answers to those. He made none of those assumptions. He just sat there and said, one day, somehow, sometime, you'll get to over 50%. That's his theory. But even if all of that were true, and even if there were high barriers to entry, it's still not a violation of Section 2. Because we're sitting here today looking at conduct that has occurred, determination primarily, and then we're speculating about unrelated conduct in the future, which isn't in and of itself anti-competitive. And here's where plaintiffs are wrong. You will not find a course of conduct case that says you can just look at all of this conduct together, mush it together, and say you'll get to 50%. You've got to have a course of anti-competitive conduct. And in answer to that one or two degrees, I'd commend the court to the Aretha and Turner Treatise, the portion that we cited here where they talk about a hypothetical and they say, suppose you had two companies. Each had 10%. They merged. And then later this company grows and grows and gets to a monopoly. Is that monopolization? No, it's not. Why isn't it? Remember the teaching of Trinko again. Trinko says that there's nothing unlawful about achieving a monopoly in and of itself. There's even nothing unlawful about charging a monopoly price if you've lawfully acquired a monopoly. What's unlawful is achieving your monopoly through anti-competitive means. And so if we haven't done anything anti-competitive, and in the future aren't going to be doing anything anti-competitive, but it is in fact the case that we glide to a monopoly as their expert somehow thinks we will, we haven't violated the law. And for a court to sit here now well in advance of these speculative, not anti-competitive acts, and say this is enough to get to a jury on an attempt to monopolize the case would be a gross mistake. And the district court judge got there. He got there on the barriers to entry argument. But there are many ways to get there. Their theory of monopolization is another way to get there because it's not supported by the course of conduct cases. Mr. Ross, you mentioned at the outset that there were a number of grounds on which we could uphold the district court. You've talked about a number of them in your remarks here. What's your strongest ground? I think it's barriers to entry, and I think it's conduct. The conduct that we've described, let me put this conduct in context. You have a health plan that makes decisions as to who to put on its panel. If this court says that health plans can't do that any longer in the absence of any showing that they have market power, then every health plan is going to have to put every willing provider on the panel. If that happens, is that going to be competition? The panel would say yes because their idea of competition is if you have a panel with everybody on it, that's competition. But that is a misunderstanding of competition. Competition is when you have different health plans in a marketplace that structure themselves as they see fit and compete with each other. The Blue Cross Blue Shield plan puts everybody on it. Kaiser is at the other end of the spectrum and says we're only going to offer you Kaiser providers. Providence is somewhere in between. The Providence health plan believes that it's important to feature the Providence providers and some others to fill in gaps. And if the plaintiffs are correct that we can't select people, then we'll have everybody on our panel. Kaiser is going to have to do the same. There's absolutely no logical reason why this stops with us and doesn't extend to Kaiser, especially given that they're a much bigger health plan. And every health plan will look exactly the same. And when that happens, you have no more choice. You have a couple of other consequences, too. Providers now know they're guaranteed to get on a health plan. There's no reason for them to negotiate their rates any longer. What's going to happen? Every health plan will have the same cost structure, because you've got all the same providers, and it'll be a high cost structure. The Department of Justice and Federal Trade Commission warned against this very result. A number of states are considering laws that would statutorily mandate health plans take every provider. The state of Oregon is considering such a law. It is being sponsored by the two plaintiffs in this case. If such a law were to pass, the Department of Justice and the FTC said, you'll eliminate competition, you'll have all health plans looking the same, all with higher health care costs, and the result's going to be fewer people have insurance, fewer people have coverage, and our market system doesn't work. Many arguments were made along the lines of a lack of transparency and so forth. I think two things. First of all, outpatient diagnostic imaging costs are 17 percent of all outpatient costs. That's in the Jackson Affidavit, so it's not a trivial little amount. Secondly, the people who are cost sensitive here are the payers and the employers, the folks who assemble these plans and then who have to purchase them. And they, of course, are extremely cost sensitive. Look at Allison Miller's declaration. She's the head of the PPO in which she says that they've lost 30 percent of their enrollment over three years. That's happening because there's intense competition because people are extraordinarily price sensitive. In conclusion, Your Honor, we do respectfully request that this Court affirm the entry of summary judgment below. Thank you. Thank you, Mr. Roth. This is, of course, a conduct case, and the courts throughout the country have recognized that individual anti-competitive acts in combination can have a greater impact than any individual tactic by itself. We're not suggesting that every single one of the acts independently is illegal, but when used in a sequence or a combination that has the effect of pushing Providence above the 50 percent mark in terms of the volume of diagnostic imaging that is occurring at its facilities is a path to monopolization, and it's illegal under the Sherman Act. The example that Mr. Roth used in their brief concerning AREDA is instructive. It's a situation where A merges with B. Each has a 10 percent market share. Does that raise any antitrust concerns? No, because it's only 20 percent of the market. Here we have four different imaging markets. Providence is in two of them right at the presumptively sufficient share of 44 in Rebel Oil and Weyerhaeuser, and we have a situation where it's anti-competitive behavior. They characterize the conduct in a wholly defense-oriented way on a highly factual inquiry. Conduct that is examined in an antitrust case can be clothed with a valid business justification, a pro-competitive argument made by the defense, while at the same time looked at in context it may well be anti-competitive in that it impedes the ability of competing firms to compete for customers or resources. That's exactly what we're alleging here. This is not 10 plus 10 is insignificant. This is above 40 plus projected anti-competitive behavior that's right out of their own strategic plans. Acquiring a competitor hospital, acquiring a competitor health plan, controlling or employing 50 percent of the entering doctors coming into the ______. Do any of those future events relate to the imaging market? They all seem to have to do with what I've talked about before, market power someplace else, not about the conduct that's the subject of complaint here. Well, if you take, for example, the plan that they have in their strategic documents, this is specifically the one regarding physician strategies, it says that their goal is to acquire through employment or other alignment mechanisms half of the physicians entering the Portland market every year. And above that particular reference is the fact that the benefit of employing physicians is that there are barriers to exit from the Providence system. By having more and more doctors come into their system, they then control the referrals from those doctors for imaging to radiologists within their system. So a barrier to entry, according to Areta and Turner, is any, and the Southern Pacific case, is any structure, any market mechanism that the defendant develops to increase their market share. What's your response to Mr. Ross's point that the real payors here are the employers or the individual groups that are looking around in the insurance market in order to find the best health coverage plan that they can for their employees. And if Providence is charging higher rates because their diagnostic imaging costs are artificially high because they're acting like a monopolist, why aren't those purchasers going to go to Blue Cross Blue Shield or some of the other competing health plans that offer the same services at lower rates? Because the purchasers are ultimately the patients. And as our expert tried to explain, I think... Not really. The purchasers are the people who are paying the premiums. And in most cases, those are going to be group insurance plans, which are typically employers. Well, no, they're typically the employer or they're typically the employee. These days, more and more of the share of... Well, the employee may be paying some sort of a, what do you call it, copayment, but they're not usually paying the full price of the actual... Well, not the full price, but they're often paying a significant portion of either their or their family's insurance coverage. And they have a copay or a deductible, and so they are the consumer. The patient is the consumer. I'm having a hard time following that because your argument... Let's assume that the copay is 20%. Your argument is that I'm going to choose my health care provider on the basis of 20% of what? I mean, all I look at as a patient is, what am I going to have to pay out of my paycheck for my share of participation in this health care plan? I don't have any information on what my radiologist is going to charge if down the road my physician sends me for an MRI. Well, that's one of the reasons why monopolistic pricing by Providence, once they're above 50%, could persist, because there are high switching costs. You typically stick with a health plan through your employer because you have a particular primary care physician. Why will the employer keep that health plan if he's paying a super premium price? Why would he switch to somebody with a different network of providers that has a lower price? Because when one looks at the way the health system works, the cost of imaging is bundled. It's a small percentage of the total premium. It's bundled in. You don't want to switch from your primary care physician. The super competitive price is not going to have an overall very significant impact on the price difference between one health plan versus another health plan. But Providence's goal, as you describe it, isn't to capture 50% plus of the imaging market. It's to capture 50% plus of the health care market. That's where the market power is. And it's bizarre to think that if they have that kind of market power and control over the patients and the payors, they're only going to do it to get a little bit here in the imaging services. If they're going to be a monopoly, they're going to be a serious monopoly and collect all around. Why would they use this enormous market power in controlling the patients and payors only to get a few bucks here over in imaging services and nothing else? Well, we can only attack one product market at a time. And the fact that that strategy is going to have benefits in multiple markets may well be true, Your Honor, but it doesn't undermine the fact that here the district judge looked at all five elements of the attempted case, found that we had evidence sufficient to survive summary judgment on four, and on barriers to entry we respectfully suggest that he erred and there was plenty of evidence to send this case to the jury. All right. Thank you both counsel. The case was very well argued. It is ordered and submitted, and we'll get you a decision as soon as we can.
judges: Tallman, Clifton, Smith